UNITED STATES of America,
Plaintiff,

v.

Herman ADAMS, d/b/a Adams Manufacturing Company, Defendant.

Civ. A. 1337.

United States District Court
W. D. Arkansas,
Fort Smith Division.

March 7, 1958.

———◆———

Charles W. Atkinson, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Ft. Smith, Ark., for plaintiff.

Dale L. Bumpers, Charleston, Ark., Mark E. Woolsey, Ozark, Ark., for defendant.

JOHN E. MILLER, District Judge.

This is an action by the plaintiff, United States of America, against the defendant, Herman Adams, d/b/a Adams Manufacturing Company, growing out of a contract between the parties whereby the defendant undertook to manufacture and deliver to plaintiff a large number of wooden tent pins. Plaintiff alleges that the defendant defaulted, and that under the terms of the contract plaintiff purchased similar tent pins from another supplier at an excess cost of $4,-810.83, which amount plaintiff is entitled to recover from the defendant.

The defendant in his answer raised two defenses: first, that the default arose out of causes beyond his control and without any fault or negligence on his part, and under the terms of the contract he would not be liable for excess costs; and second, that any excess cost incurred by the Government was caused by its own negligence and lack of diligence in purchasing the tent pins after it declared defendant to be in default.

Upon these issues the case was tried to the Court without a jury on January

29, 1958, and at the conclusion of the trial the Court took the case under advisement pending receipt of briefs from the parties. Having received the briefs and having considered the pleadings, evidence, and briefs of the parties, the Court now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

Findings of Fact

1.

The plaintiff is the United States of America. The defendant is a citizen of Arkansas and a resident of the Fort Smith Division of the Western District of Arkansas.

2.

In 1953 and 1954 the defendant, Herman Adams, was engaged in the business of manufacturing wooden products, such as wooden boxes, pallets, and stakes, a large majority of which were sold to the United States. His place of business was located in Charleston, Arkansas.

Some of the contracts between Adams and the United States were negotiated contracts, i. e., contracts which were entered into after negotiations and discussions between the parties. Other contracts entered into between Adams and the United States were the result of successful bids by Adams; i. e., the United States, through the particular agency involved, would issue invitations for bids for the particular product involved and Adams would be the successful bidder.

In the latter part of 1953, Adams negotiated with the Contracting Officer of the Chicago Quartermaster Depot, United States Army, for a contract (defendant's Exhibit No. 1) under which Adams would manufacture wooden tent pins for the Army. In the course of the negotiations the following letter (defendant's Exhibit No. 2) was written by Adams' Assistant Manager, A. R. Schaffer, to the Contracting Officer:

"Dear Sir:

"The pre-award survey of our plant facilities made by Mr. M. A. Friend, of the St. Louis QM Office,

presented an excellent opportunity for a detailed study of the bid we submitted on the captioned proposal. Although we have had ten years of highly satisfactory production experience on ammunition boxes and pallets, this was our first venture on a Quartermaster item—and it was a welcome pleasure to be enlightened by a man of Mr. Friend's apparent competence in such matters. The discovery of two errors of omission in our bid calculations is proof that his visit was beneficial.

"We would like to request that our bid be amended to allow for these oversights, as discussed below, but first wish to state that we shall fulfill the entire contract as originally bid—should you determine that it ought to be awarded to us on that basis.

"To begin with, we deliberately bid this proposal at what we thought was the lowest possible figure, because we honestly believed that we had worked out a source of raw material which could save the Government a considerable amount of money and still make us a reasonable profit. Our plan was, and still is, to grade the No. 1 and No. 2 Red Oak needed for this contract out of the rough hardwood which we buy in quantities averaging 100,000 bd. ft. per week for production of pallets. This lumber is delivered to us at $45 or $50 per M, in almost any quantity we require, and experience has shown us that as high as 50% of it would grade out as No. 1 or No. 2. We therefore believed that the production of tent-pins would fit hand-in-glove with our already scheduled pallet production.

"However, after analyzing the matter with Mr. Friend, we come to the conclusion that we failed to make allowance for two important items:

"1. *The rejection factor.* Due to our system of overlapping plant inspections by shop foreman and em-

ployees, we have enjoyed an enviable record of very limited rejections with current and previous Government contracts—and have reached the point where we no longer make any provision for this factor in our bids. But we have apparently not faced anything approaching the quality control standards of the Quartermaster Department. Also, the intended source of our lumber for this contract seems to further enhance the rejection potential. After our discussion with Mr. Friend concerning QM inspection procedures and his interpretation of the specifications, we talked to some Arkansas manufacturers who have had QM experience—and it now appears that a *minimum* allowance of 20% of gross end product should be made for rejections.

"2. *Packing and crating.* A three-way conversation between Mr. Friend, Mr. Adams, and the undersigned revealed a misunderstanding of instructions within our plant in calculating this particular item. Normally, all of our bids for finished products are figured at so many dollars per M on gross board footage before cutting and surfacing—and we had interpreted Mr. Adams' directions to mean that the figure so calculated would be the FOB plant price per *packaged* pin. Actually, he intended it to be the price per finished pin, before crating. We are not, therefore, covered for the *cost* of the crate, although the *weight* of the crate *was* considered in arriving at shipping expenses.

"Due to the above omissions, we now find it necessary to request amendment of our 16 November bids, adding $0.01784 per pin for Item 1 (Type I, 16″) and $0.02542 per pin for Item 2 (Type II, 24″). These are additions to FOB plant prices, there being no change in delivery costs involved. A complete modified schedule of bids for each destination is attached, to avoid the

need of your making the individual calculations.

"It is almost needless to say, but we are greatly indebted to you for initiating the pre-award survey which brought these matters to light. We again express our willingness to go ahead with the contract as originally bid, absorbing the threatened loss, should you see fit to demand its performance—but your favorable consideration of our request for amendment would be most sincerely appreciated. Should we remain low bidder despite these increases, you may be assured of our utmost cooperation throughout the life of the contract.

"Very truly yours,
"Adams Manufacturing Company
"A. R. Schaffer
"Ass't. Manager"

On December 30, 1953, the negotiated contract was entered into between Adams and the Chicago Quartermaster Depot, United States Army, under which Adams was to manufacture 1,369,525 wooden tent pins for a total consideration of $123,391.51. With respect to inspection of the pins the contract contained the following provisions:

"Inspection and Acceptance: Saving and reserving to the Government all rights under the Inspection provision, the procedure of Inspection for compliance with contract requirements at Contractor's plant and inspection (quantity and condition) and acceptance at destination will be followed.

"Shipment must *Not* be made prior to inspection by either the Chief, QM Inspection Division, Chicago Quartermaster Depot or his authorized representatives. Contractor must notify the Chief, QM Inspection Division, Chicago Quartermaster Depot, 1819 West Pershing Road, Chicago 9, Illinois, when the items as called for herein are ready for inspection. Items Should *Not* Be Packed In Sealed Containers Prior To Inspection. (If practicable

2 weeks advance notice is requested.) Should shipping point differ from that which is shown herein, contractor must so advise both the Contracting Officer and the Chief, QM Inspection Division, Chicago Quartermaster Depot.

"Material Inspection Receiving Reports: Shipment of the items as called for herein will be made, utilizing Material Inspection Receiving Reports to be furnished by this office. Shipment must not be made without same."

With regard to inspection, paragraph 5(a) of the General Provisions of the contract provided as follows:

"(a) All supplies (which term throughout this clause includes without limitation raw materials, components, intermediate assemblies, and end products) shall be subject to inspection and test by the Government, to the extent practicable at all times and places including the period of manufacture, and in any event prior to final acceptance."

After the contract was entered into Adams began purchasing No. 1 and No. 2 red oak lumber which he intended to use in the production of the tent pins. Preparations were made for producing the pins, and on February 1, 1954, an inspection plan was executed by Leland S. Foster, one of plaintiff's inspection supervisors, delineating the method of inspection that would be used on the job (Defendant's Exhibit No. 3). Among other things the inspection plan provided that the point of acceptance inspection was "End item"; that the lot size would be a minimum of 8,001 and a maximum of 22,000; and that the "presentation" would be stationary. Under the heading "Special Details Governing Physical Arrangements of Product", it was provided that "Units, after final machining and before the treatment, will be stacked on pallets. Samples for visual and dimensional check will be selected at this point".

At the time this inspection plan was formulated the inspector on the job was T. T. Flint. About March 1, 1954, a new inspector, Joe Burkhart, replaced Flint. Burkhart appeared at approximately the time full-scale production began on the tent pins. For some reason and under some authority not shown by the record, Burkhart began making additional requirements of Adams over and above the requirements stated in the contract. For one thing, he required Adams to set up four inspection points rather than the one inspection point provided in the inspection plan executed by Foster. In addition to that, Burkhart was extremely strict in his requirements concerning the grade and quality of the lumber used to produce the tent pins. In fact, his inspection was so rigid he rejected 58.86 percent of the lumber that Adams had purchased for use in fulfilling the contract. These rejections were made at various stages of production.

As an indication of the rigidness of Burkhart's inspection, a large percentage of the tent pins rejected by Burkhart were subsequently accepted and purchased by the Government after additional inspections made by other inspectors. To be more specific, approximately 190,000 of the tent pins which were rejected by Burkhart were stored by Adams, and of this amount the Government subsequently inspected and accepted from 78 to 90 percent of said pins.

As a result of the rigid inspection procedures used by Burkhart, Adams' production system was disrupted, and he was unable to use much of the lumber he had purchased to fulfill the contract. As a net result Adams sustained a substantial loss in fulfilling the contract.

3.

Adams delivered all the tent pins called for under the negotiated contract of December 30, 1953. He made many oral objections to Burkhart and to Burkhart's superior, Foster, concerning the inspection techniques of Burkhart. However, Adams did not make a formal protest to the Contracting Officer.

**4.**

While the negotiated contract was being performed, the Chicago Quartermaster Depot advertised for bids for 365,300 wooden tent pins, 147,800 to be f.o.b. Memphis, Tennessee; 120,000 to be f.o.b. Lyoth, California; and 97,500 to be f.o.b. cars, Contractor's Plant. The pins called for were 24-inch wooden tent pins, Type II, in accordance with Military Specification MIL-P-2383A. (The pins were 24″ x 1⅟₁₆″ x 1½″.)

On page 2 of the schedule, which was apparently attached to the invitation for bids, it was provided:

"Evaluation of Bids: Bids will be evaluated on the basis of overall cost to the Government. In connection with bids submitted on an F.O.B. Cars, Contractor's Plant basis, transportation costs between bidder's shipping point and the designated destination points will be considered in determining the lowest ultimate cost to the Government, based on the estimated weight of *160 pounds per case of · 100 item.*"

On page 8 of the schedule under the heading "Shipping Data" there were certain blanks to be filled in by the bidder. In the proper blanks Adams specified that the shipping weight per container would be 124 lbs. and that the size of the container would be 27 inches long, 16½ inches wide, and 12⅛ inches high. *Adams was the successful bidder* on the contract, his total bid being $36,-186.53, and the contract (Plaintiff's Exhibit No. 1), as awarded April 21, 1954, provided on page 2 that the shipping weight would be 124 lbs. per case of 100.

**5.**

During the summer of 1954, Adams was indebted to the First National Bank of Fort Smith, Arkansas, for a substantial sum of money. The bank had a mortgage on Adams' property to secure this indebtedness. As a result of the loss sustained by Adams on the December 30, 1953, negotiated contract (Defendant's Exhibit No. 1), he was unable to pay the debt to the bank, and the bank foreclosed the mortgage.

On October 15, 1954, Major Edward C. Willecke, Contracting Officer, wrote Adams notifying him that the contract of April 21, 1954 (Plaintiff's Exhibit No. 1), was being terminated because of Adams' default. In the letter Willecke stated:

"Reference is made to Contract No. DA11-009-QM-23925, dated 21 April 1954, which provides for the furnishing of 365,300 each, Pin, Tent, Wood, 24″, Type II, at the unit prices, F.O.B. delivery points, and in accordance with the specifications therein cited, at a total contract amount of $36,186.53. The said contract further provides for delivery of the supplies involved during the period 10 May – 25 September 1954, in accordance with the Schedule of Deliveries therein set forth.

"As of the date hereof, you have delivered a total of 111,400 each, Pins, under the said contract and have failed to deliver the following:

| | | | | | | |
|---|---|---|---|---|---|---|
| Item 1c | 117,300 | each, Pins @ | $.0976 | F.O.B. | Memphis, Tenn. | |
| Item 1e | 63,000 | " " " | .1070 | " | Lyoth, Calif. | |
| Item 1n | 73,600 | " " " | .0915 | " | Cars, Contractor's Plant | |

"Therefore, you have failed to deliver a total of 253,900 each, Pins, as called for by the said contract. Inasmuch as your company is now in receivership under a mortgage foreclosure, it has been determined that you are unable to produce the balance due under the said contract. Therefore, it is the finding of the undersigned that your failure to deliver the balance of 253,900 each, Pins, within the time specified by

the said contract is not due to causes beyond your control and without your fault or negligence within the meaning of General Provision 11 of the said contract, entitled 'Default'.

"Accordingly, you are advised that your failure to deliver the balance of 253,900 each, Pins, is hereby treated as a breach of the said contract on your part and the Government considers itself discharged of its obligations thereunder. In accordance with said General Provision 11, 'Default', your right to proceed with the further performance of the said contract is hereby terminated. Pursuant to subparagraph (c) of the said General Provision 11, the supplies terminated by this Notice will be purchased elsewhere, and any excess costs incurred will be charged against you. The Government reserves all rights and remedies provided by law or under the said contract in addition to charging excess costs."

Willecke also advised Adams that if he was dissatisfied with the decision he could appeal to the Secretary of the Army.

Adams did not appeal from the decision of the Contracting Officer.

6.

On October 22, 1954, the Chicago Quartermaster Depot issued invitations for bids for 253,900 wooden tent pins, 24 inch, Type II, in accordance with Military Specification MIL-P-2383A. On page 2 of the schedule under the heading "Evaluation of Bids" it was provided that bids would be evaluated upon the basis of an estimated shipping weight of 160 lbs. per case of 100 pins. On page 6 of the schedule under the heading "Shipping Data" there were blanks to be filled in by the bidder indicating, among other things, the shipping weight per container.

The successful bidder for this contract (Plaintiff's Exhibit No. 2) was Interstate Manufacturing Company of Columbus, Mississippi. Interstate's bid was $.114 per unit, f.o.b. cars, Contractor's Plant. On the original contract of April 21, 1954, defendant's bid was $.0915 per unit for the pins that were delivered f.o.b. cars, Contractor's Plant.

In making its bid, Interstate Manufacturing Company did not fill in the blanks under the heading "Shipping Data" to indicate the shipping weight per container contemplated by Interstate. However, the contract, as awarded to Interstate, on page 2 provided that the shipping weight was to be 160 lbs. per 100 units. Although the shipping weight was stated in the contract to be 160 lbs. per 100 units, the pins actually manufactured and shipped by Interstate to the Government weighed approximately 124 lbs. per 100 units.

The shipping weight of the pins was not a specification of the Government, but was merely an item of information needed by the Government to evaluate the transportation costs which might be incurred by the Government on bids submitted upon a f.o.b. cars, Contractor's Plant, basis.

7.

In the event defendant had completed the contract of April 21, 1954, the cost to the Government of the 253,900 undelivered tent pins would have been $25,458.19. Under the replacing contract with Interstate Manufacturing Company the actual cost to the Government was $30,269.02. Thus, the excess cost to the Government was $4,810.83.

8.

The contract of April 21, 1954, sued upon herein, contained the following standard provisions:

"11. Default

"(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time

specified herein or any extension thereof; or

"(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.

"(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

"(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

 \*  \*  \*  \*  \*  \*

"12. Disputes .

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish· a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."

### Discussion

The principal questions of law involved in the instant case have already been passed upon by the Court in connection with the disposition of a motion for summary judgment filed by the plaintiff. In passing on the motion for summary judgment the Court on June 8, 1957, wrote the attorneys for the parties a memorandum letter opinion giving the Court's reasons for overruling the motion. In that letter the Court made the following statements:

"Gentlemen:

"The briefs of the parties have been received, and plaintiff's motion for summary judgment is now ready for disposition.

"Plaintiff contends that the determination made by the Contracting Officer is final, particularly in view

of the fact that defendant did not appeal to the Secretary of the Army. Defendant contends that the determination by the Contracting Officer is not final, and in any event that defendant has the right to show that the excess cost incurred by plaintiff was due to its own lack of diligence.

"The Court is of the opinion that plaintiff's motion for summary judgment must be denied for two reasons: (1) the Contracting Officer's determination was one of law, and therefore not final; (2) even if the Contracting Officer's decision was final, defendant would be entitled to litigate the question of excess costs.

"It is now established that a decision of the head of any department or agency or his duly authorized representative in a dispute arising out of a contract entered into by the United States is not final if the decision is fraudulent, capricious, arbitrary, so grossly erroneous as to necessarily imply bad faith, or is not supported by substantial evidence. 41 U.S.C.A., Sec. 321.

"41 U.S.C.A., Sec. 322, provides:
" 'No government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.'

"These statutes were enacted to overcome the decision of the Supreme Court in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113, and to establish a uniform system of judicial review in such cases. Volentine & Littleton v. United States, 145 F.Supp. 952, 953 [136 Ct.Cl. 638]. And the policy of the statutes should not be interpreted in a niggardly manner. United States v. Lennox Metal Mfg. Co., 2nd Cir., 225 F.2d 302, 319; United States [for Use of Bangor Roofing & Sheet Metal Co.] v. T. W. Cunningham, Inc., D.C.Me., 141 F.Supp. 205, 207.

"However, the statutes were not intended to eliminate the necessity of contractors appealing decisions of contracting officers to the head of the department. See, Legislative History, 1954, U.S.Code Congressional and Administrative News, p. 2196. As to questions of fact it is necessary for the contractor to appeal to the head of the department, unless the contracting officer makes it impossible for him to appeal as in the case of United States v. Lennox Metal Mfg. Co., D.C.N.Y., 131 F. Supp. 717, 731, affirmed [2 Cir.] 225 F.2d 302. But as to questions of law it is not always incumbent upon the contractor to appeal to the head of the department. See, Allied Contractors v. United States, 124 F.Supp. 366 [129 Ct.Cl. 400], and cases therein cited. In the instant case, in the notice of termination the Contracting Officer, after stating that delivery of all the pins had not been made, stated:

" 'Inasmuch as your company is now in receivership under a mortgage foreclosure, it has been determined that you are unable to produce the balance due under the said contract. Therefore, it is the finding of the undersigned that your failure to deliver the balance of 253,900 each, Pins, within the time specified by the said contract is not due to causes beyond your control and without your fault or negligence within the meaning of General Provision 11 of the said contract, entitled "Default" '.

"The only finding of fact made by the Contracting Officer was that defendant was in receivership under a mortgage foreclosure. The Contracting Officer then concluded as a matter of law that the failure of defendant to deliver the remaining pins was not due to causes beyond defendant's control and without fault or negligence within the meaning of the contract.

"The interpretation of the contract is a matter of law. John A. Johnson Contracting Corp. v. Unit-

ed States [132 Ct.Cl. 645], 132 F. Supp. 698, 703. And, of course, the determination of whether defendant's failure was due to negligence is a matter of law. It follows that defendant is entitled to a judicial determination of this question.

"Moreover, even if the Contracting Officer's determination was conclusive as to the cause of defendant's default, defendant would still be entitled to question the excess costs now charged against him by the Government. In this connection, the Contracting Officer in his notice of termination on October 15, 1954, merely determined that defendant would be charged with the excess costs, if any, but, of course, no determination was made as to what the excess costs might be or how they would be calculated. So far as the record shows, it was not until the filing of this suit on January 14, 1957, that defendant was advised of the excess costs claimed by the Government. The Government had a duty to mitigate the damages. See, Langoma Lumber Corp. v. United States, D.C.Pa., 140 F.Supp. 460, 462. See also, National Wood Products, Inc., v. United States, Ct. of Claims, 146 F.Supp. 451.

"Therefore, defendant is entitled to litigate the question of whether the excess costs were reasonably incurred by the Government.

"In view of the foregoing, an order is being entered today denying plaintiff's motion for summary judgment."

In accordance with the Court's ruling on the motion for summary judgment the parties proceeded to trial upon two issues: (1) whether the excess costs were reasonably incurred by the Government within the meaning of the contract, and (2) whether the failure of the defendant to complete performance of the contract was due to causes beyond his control and without his fault or negligence within the meaning of the contract.

Upon the first issue the defendant contends that the contract between the Government and Interstate Manufacturing Company was not, in fact, a contract "replacing" the contract between the Government and Adams, but was the result of the "placing" of a new contract by the Government. This contention is based upon the difference in the shipping weight of 124 lbs. per 100 units provided for in the Adams contract and the shipping weight of 160 lbs. per 100 units provided for in the Interstate Manufacturing Company contract.

The Court is of the opinion that this contention of the defendant is without merit. As stated in Finding of Fact No. 6, the shipping weight of the pins was not a specification of the Government, but was merely an item of information needed by the Government to evaluate the transportation costs which might be incurred. This is forcibly demonstrated by the fact that the pins actually shipped by Interstate Manufacturing Company only weighed approximately 124 lbs. per 100 units rather than 160 lbs. per 100 units.

In this regard it must be remembered that paragraph 11(c) of the General Provisions of the contract provided that the Government could procure "upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services *similar* to those so terminated". (Emphasis added.) In other words, it is not absolutely necessary that the replacing supplies be exactly the same as those called for by the original contract. It is sufficient if the supplies are substantially similar, and the Court is convinced that in the instant case the pins called for by the Government and supplied by Interstate Manufacturing Company under the replacing contract were substantially similar (if not identical) to the pins called for under the contract between Adams and the Government.

With regard to the second defense raised by the defendant, paragraph 11 (b) of the standard provisions of the contract provided that the contractor

would not be liable for any excess costs "if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the contractor".

In the instant case the defendant's inability to complete the contract was caused by the foreclosure of a mortgage on defendant's property. Of course, the mere fact that a mortgage was foreclosed on defendant's property, thus preventing him from carrying on his business, does not in itself establish that the foreclosure was caused by the fault or negligence of the defendant or by something over which the defendant had control. To determine this question the Court must look behind the foreclosure and ascertain the cause thereof.

The inability of defendant to pay the indebtedness owed the First National Bank and to prevent the foreclosure was caused by the loss sustained by the defendant in the performance of the negotiated contract of December 30, 1953, between defendant and the Government. And a consideration of all of the evidence convinces the Court that this loss was due to two factors. The first factor was the over-zealous and changed inspection procedure used by Joe Burkhart, representing the Chicago Quartermaster Depot. (See Finding of Fact No. 2.) The second factor was the mistake of the defendant in thinking that he could obtain the necessary lumber for producing the tent pins at a cost of $45 to $50 per thousand, whereas, in fact, the lumber he actually used cost him an average of $83 per thousand. This was a mistake of judgment on his part, but the Court is of the opinion that it was not such a mistake as would amount to fault or negligence on the part of the defendant within the meaning of the contract.

The evidence submitted to the Court established that the primary cause of defedant's financial difficulty and the resulting foreclosure of the mortgage on defendant's property was the action of the inspector in making unnecessary requirements above and beyond those called for by the contract. The Government contends that under paragraph 5 (a) of the General Provisions of the contract it had the right to inspect the tent pins, and of course this is true. However, in the inspection plans formulated for this particular contract it was provided that the point of acceptance inspection would be "end item". In complete disregard of this plan the inspector, Burkhart, required defendant to set up four inspection points. His inspections were so rigid that 58.86 percent of the lumber Adams had purchased for use in fulfilling the contract was rejected.

The inspections were arbitrary and not in conformity with the procedures and requirements as set forth in the agreed inspection plan. The defendant stored 190,000 of the rejected pins. Later the Government purchased from 78 to 90 percent of the rejects (the percentage varied according to lot), but the purchase by the Government was not made until after the defendant had defaulted on his indebtedness to the bank. In other words, the act of the Government in recognizing the mistake that had been made by its inspector came too late and after the foreclosure by the bank. Mr. Adams testified that the wrongful rejection of the pins created his inability to complete the performance of the contract sued upon in this action. The Government did not introduce any testimony in contradiction of this testimony of the defendant, Adams. It is true that Adams was unable to state definitely the amount of the damage that he suffered by reason of the wrongful inspections, but the Court is convinced that the damage was substantial and, no doubt, was a contributing factor in bringing about the default in the performance of the contract now in question.

A consideration of all the evidence convinces the Court that the failure of the defendant to complete the contract was due to causes beyond his control and without his fault or negligence within the meaning of the contract. Therefore, a judgment should be entered dismissing plaintiff's complaint.

Conclusions of Law

**1.**

The Court has jurisdiction of the parties and the subject matter herein.

**2.**

The failure of defendant to complete performance of the contract involved in the instant case was due to causes beyond his control and without any fault or negligence on his part, and therefore plaintiff is not entitled to recover the excess costs incurred by it in procuring the tent pins from another source.

**3.**

The complaint of the plaintiff should be dismissed.

A judgment in accordance with the above should be entered.