AMERICAN SURETY COMPANY OF NEW YORK, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17107.

United States Court of Appeals Eighth Circuit.

May 28, 1963.

Clifford B. Kimberly, Kansas City, Mo., made argument for appellant.

John C. Eldridge, Atty., Civil Division, Dept. of Justice, Washington, D. C., made argument for appellee. Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Civil Division, Dept. of Justice, Washington, D. C., F. Russell Millin, U. S. Atty., Kansas City, Mo., and Sherman L. Cohn, Atty., Dept. of Justice, Washington, D. C., were with him on the brief.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

This suit was instituted by the United States against Hawthorn Manufacturing

Company and its surety for breach of a defense contract for the supply of bomb rack releases to the Air Force. The damage claimed, approximating $29,000, was the increased cost incurred by the government in procuring the releases from another source. Hawthorn's principal officer, Fred N. Pierson, who had indemnified the surety company, was drawn into the litigation by the surety by appropriate third party procedure. Hawthorn, which in the meantime had forfeited its corporate charter, could not be served, and the action as to it was dismissed. The case was defended by the surety and by Pierson. It was tried on documentary evidence and the administrative record before the Armed Services Board of Contract Appeals. Judgment was entered in favor of the government and against the surety for the amount claimed and in favor of the surety and against Pierson for the amount the surety may be required to pay the government. Only the surety has appealed.

The trial court's memorandum opinion is now reported as United States v. Hawthorn Mfg. Co., W.D.Mo., 1962, 211 F.Supp. 222. It and the record before us disclose the following:

1. In May 1949 the government issued an invitation for bids to supply 16,438 releases. The invitation stated that delivery was desired at a rate of "500 per month starting December 1949 (each hand)". Hawthorn bid $9.66 per unit. As later adjusted to $9.96, this made a total bid of approximately $164,-000. The bid was accepted but Hawthorn received the formal award only in mid-September. Because of this delay it proposed a revised delivery schedule calling for 100 releases for each hand in January and February 1950, 250 in March, 350 in April, and 500 monthly thereafter. This appears to have been acceptable to the government.

2. The contract provided that it could be terminated by the government if Hawthorn failed or refused to perform within the time specified; that the government could hold the contractor liable for any damage caused by the termination; that disputes thereunder were to be decided by the contracting officer; and that an appeal could be taken from that officer's decision to the Secretary of War "whose decision or that of his designated representative * * * or board shall be final and conclusive upon the parties hereto". The administrative agency so designated was the Armed Services Board of Contract Appeals.

3. The performance bond contained the usual provisions and related as well to extensions of the contract's term "with or without notice to the surety" and to contract modifications, "notice of which modifications to the surety being hereby waived". It contained no provision requiring notice to the surety in the event of Hawthorn's default.

4. Hawthorn failed to fulfill its obligations under the contract and, in fact, never produced a single bomb release. Finally, on February 15, 1950, when clearly in default, Hawthorn asked permission of the contracting officer to use in its release the Leland type of rotary solenoid in place of the one described in in the specifications. Hawthorn was promptly advised that, although the government was interested in new developments, the solenoid required by its contract would not then be changed. Hawthorn had complained about the original solenoid, the difficulty of manufacturing it, and an alleged high rate of rejections in connection with its prior manufacture.

5. On February 23, 1950, the contracting officer by letter notified Hawthorn of its technical default since January and threatened termination of the contract, pursuant to its terms, unless satisfactory evidence of ability to correct the delay was forthcoming. The officer sent a copy of this letter to the surety on March 1 "to make you cognizant of the delinquent condition of subject contract". This apparently was the first notice of any difficulty given to the surety.

6. In April 1950 Hawthorn decided not to proceed with the contract. A new

invitation for bids to supply releases was issued by the government in May. This was for 11,426 units with an option to call for 16,438 additional units, the exact number covered by the Hawthorn contract. Bids were requested on both the smaller amount and on the total. A required delivery schedule of 800 units per month, each hand, starting August 1950 (and a peak of 1,500 per month, each hand, under the option) was specified. A number of bids were received. The lowest, at prices below Hawthorn's earlier accepted bid, was that of Connecticut Telephone & Electric Company. This bid, however, specified a delivery schedule starting 210 days after receipt of the order (rather than August 1950). An attempt to persuade Connecticut to advance its delivery date was not successful. The next lowest bid was that of R. E. Dye Machine and Supply Company. This came in at $12.74 on the 11,426 units and at $11.74 if the option were exercised and the entire 27,864 units were ordered. The government accepted the Dye bid for 11,426 units on June 1, 1950.

7. On June 13 Dye asked permission to use the Leland solenoid. About this time Dye also asked permission for certain minor other changes at no cost to the government. On July 25 the Air Force formally approved the Leland solenoid. Permission was then promptly granted Dye to employ that solenoid, if it chose to do so, and to indulge in the other requested changes in the specifications.

8. On June 21 Hawthorn was given telegraphic notice suspending performance under its contract pending investigation. There is evidence in the record that a copy of this wire was also sent to the surety. Hawthorn asked for and received permission to sub-contract the 16,438 units it was obligated to supply. The time for accomplishing this was extended to August 16. It failed in this

effort. On August 18 the government formally terminated the Hawthorn contract by written communication to both Hawthorn and the surety.

9. In November the government exercised its option under the Dye contract and ordered the 16,438 releases Hawthorn had failed to furnish. This was at the $11.74 figure and thus entailed no increase in the Dye contract price for the use of the more expensive Leland solenoid. Hawthorn's surety was not advised of the option's exercise. In March 1951 the government made demand upon Hawthorn and the surety for the $29,259.64 difference in cost between the Hawthorn and the Dye contracts.

10. Hawthorn and the surety, in accord with the provisions of the contract, both appealed to the Armed Services Board of Contract Appeals. Testimony and documentary evidence were presented at the ensuing hearing. The Board in April 1952 rejected the defenses raised by Hawthorn and confirmed the amount of the damages determined by the contracting officer. It held, however, that it had no jurisdiction to rule on any independent issue concerned with the surety's rights and granted the government's motion to dismiss the surety's appeal.

11. In October 1956 the government instituted the present action.

The surety raises in this court the same five defenses presented to the district court and listed on pp. 224–225 of 211 F.Supp., namely, (a) absence of appropriate notice to it; (b) material changes in the specifications; (c) arbitrary and capricious refusal to permit it to substitute the Leland solenoid; (d) failure to award the new contract to Connecticut; and (e) failure to divulge to Hawthorn previous experience in solenoid rejection rate.

The question of the effect upon this case of § 1 of the Wunderlich Act of May 11, 1954, 68 Stat. 81, 41 U.S.C.A. § 321 *

---

\* § 321. "No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or

agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be

(see United States v. Wunderlich, 1951, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113), was not presented to the district court by either party. It need not be considered here, for the trial court confined its review to the administrative record and to the stipulated documentary evidence and its findings agree with those of the Board of Contract Appeals. Compare Wells & Wells, Inc., v. United States, 8 Cir., 1959, 269 F.2d 412. We therefore are applying an identical standard when we examine the findings of the district court in the light of whether they are capricious or arbitrary or grossly erroneous or not supported by substantial evidence.

A. Lack of notice. The surety's argument on this point, supported by no cited authority, is that, although it received a copy of the letter of March 1, 1950, to Hawthorn threatening termination (and apparently one of the telegram of June 21 to Hawthorn suspending performance), it did not, before the formal termination, receive notice of the new invitation for bids or of the government's exercise of its option under the Dye contract. The surety suggests that the government owed it, as the responsible party, the duty of timely notice and advice of conditions which could "cause loss" so that it might proceed to assist Hawthorn financially or by locating a substitute supplier or a favorable new bidder, to negotiate with Connecticut about its delivery schedule, and otherwise to protect itself.

The answer to this argument lies in the facts (a) that the surety did receive copies of the letter of March 1 and of the telegram of June 21; (b) that, as the trial judge observed, p. 225 of 211 F. Supp.,

"[N]ever at any time was the contractor, so far as its physical plant was concerned, able to carry out any part of the contract. * * * I

think it [the surety] cannot now complain that it did not have knowledge that never at any time after the execution of its performance bond was there even a serious attempt on the part of the contractor to perform any part of the contract."

and (c) that neither the performance bond nor the Hawthorn contract contained any provision requiring notice to the surety of Hawthorn's default.

The following cases indicate the conclusiveness of this last factor alone. Streeper v. Victor Sewing Mach. Co., 1885, 112 U.S. 676, 687, 5 S.Ct. 327, 28 L.Ed. 852; American Sur. Co. of N. Y. v. United States, 10 Cir., 1940, 112 F.2d 903, 906; New Amsterdam Cas. Co. v. United States Shipping Bd., 4 Cir., 1927, 16 F.2d 847, 851–852. See Jack v. Craighead Rice Milling Co., 8 Cir., 1948, 167 F.2d 96, 100, cert. denied New Amsterdam Cas. Co. v. Craighead Rice Milling Co., 334 U.S. 829, 68 S.Ct. 1340, 92 L.Ed. 1756. Compare Continental Cas. Co. v. United States ex rel. Robertson Lumber Co., 8 Cir., 1962, 305 F.2d 794, cert. denied 371 U.S. 922. We, too, hold that, to the extent, if any, there was lack of notice to the surety here, this lack did not release it from its obligations under the performance bond.

B. Material variations. There is no contention that the Dye bid was out of line with the 1950 market price of the release. The surety argues, instead, that there were substantial variations between the Hawthorn contract and the Dye contract and that, as a consequence, the difference in the contractual costs is not a proper measure of damage. It stresses the disparity in quantity of units on which the respective bids were based (16,438 for Hawthorn; 11,426 for Dye plus the option of 16,438 more); in the amounts and time of delivery (500 per month, each hand, desired, beginning

---

filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however*, That any such decision shall be final and

conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence."

about 90 days after the contract, for Hawthorn; 800 per month, each hand, required, beginning 60 days after the contract, together with a peak delivery of 1,500 per month, each hand, 60 days after notice of the option's exercise, for Dye); and in the refusal to Hawthorn and the permission to Dye to use the Leland solenoid.

■■ The law as to material variations and their effect on the measure of damages is not in any real controversy here. Ordinarily, with respect to government procurement contracts, the "measure of damages will be the sum by which the reasonable cost of having the work done by another contractor exceeds the defendant's contract price". United States v. Conti, 1 Cir., 1941, 119 F.2d 652, 656. See Midland Land & Improvement Co. v. United States, 1926, 270 U.S. 251, 253, 46 S.Ct. 218, 70 L.Ed. 570; United States v. McMullen, 1912, 222 U.S. 460, 471, 32 S.Ct. 128, 56 L.Ed. 269; Hoffmann v. United States, 10 Cir., 1960, 276 F.2d 199, 201; Conti v. United States, 1 Cir., 1946, 158 F.2d 581, 584. On the other hand, where the second contract materially deviates from the first, "the difference in cost between the two under the familiar rules applicable to this subject" is not the standard. United States v. California Bridge & Constr. Co., 1917, 245 U.S. 337, 344–345, 38 S.Ct. 91, 94, 62 L.Ed. 332; United States v. Axman, 1914, 234 U.S. 36, 45, 34 S.Ct. 736, 58 L.Ed. 1198; Steffen v. United States, 6 Cir., 1954, 213 F.2d 266, 271. Nevertheless, even though the second contract contains some variations from the first, the standard of cost differential remains applicable if these variations are immaterial and have not affected the contract price. Doehler Metal Furniture Co. v. United States, 2 Cir., 1945, 149 F.2d 130, 133. See Steffen v. United States, supra, p. 272 of 213, F.2d; United States v. Warsaw Elevator Co., 2 Cir., 1954, 213 F.2d 517, 519; United States v. Adams, W.D.Ark., 1958, 160 F.Supp. 143, 151. Whether the contractual differences have affected the price specified in the second contract is a question of fact. Doehler Metal Furniture Co. v. United States, supra, pp. 134–35 of 149 F.2d.

■ In the light of these principles, the trial court's findings that neither the increased maximum number nor the specified monthly delivery number of the units "in anywise influenced or affected the amount of the bid", and that there was no substantial change or deviation between the Hawthorn contract and the Dye contract, justified its use of the contracts' cost differential in the measurement of damage. Despite the subsequent permission to it to use the Leland solenoid, Dye's bid related to the same release as did the Hawthorn contract and its use of the new solenoid did not result in additional cost to the government. The number of releases to which the option applied was the exact number covered by the Hawthorn contract. The presence of the option provision was obviously occasioned by the impending Hawthorn delay. There is evidence that the stepped up delivery rate was due to Hawthorn's inability to deliver. All this, in our estimation, compels the conclusion that any differences which may have existed between the Hawthorn and Dye contracts in no way affected the Dye contract price, that there was no material deviation between the two contracts, and that the cost differential is the appropriate measure of damage here.

We find nothing of significance, as the surety would suggest, in the fact that the Dye contract was let before the Hawthorn contract was terminated or, indeed, even before notice of suspension of Hawthorn's performance was issued. Hawthorn's inability to get under way to any degree and the government's need of releases made protective action on its part a matter of good business judgment. The Dye contract's option related to the same releases with respect to which Hawthorn was in default. That option was exercised only after the Hawthorn performance was supended.

■ C. The Leland solenoid. Here the surety's argument is that the govern-

ment arbitrarily and capriciously refused Hawthorn permission in February 1950 to substitute the Leland solenoid although it permitted Dye in the following June to make the same change promptly after its bid was accepted. We find no merit in this contention. The Dye contract as let concerned the same solenoid as did the Hawthorn contract. That Dye was permitted to substitute the Leland solenoid has no bearing on the continuing nature of Hawthorn's obligation. Neither is it arbitrary or capricious. The surety's argument rests on the assumption that actual approval of the Leland had been obtained or was pending, that this was known to the government and even to Dye, and that this information was withheld from Hawthorn. We do not find that the record supports this assumption, and just how all this, if true, amounts to fraud and operates to relieve Hawthorn of its preexisting contractual responsibility is not apparent to us.

D. Failure to accept the Connecticut bid. The insurmountable feature here for the surety is that the Connecticut bid was not responsive to the invitation's specified beginning delivery date. This is spelled out in the trial court's opinion, p. 226 of 211 F.Supp. The surety's suggestion to us that the Connecticut bid right have been different had that bidder also been afforded the opportunity to use the Leland solenoid is speculative and not persuasive.

E. Failure to divulge previous solenoid rejection rate experience. Assuming that this point is properly before us (it was evidently not raised before the Board of Contract Appeals), it also is fully answered by the district court's comments at p. 225 of 211 F.Supp. and they need not be repeated here. Christie v. United States, 1915, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933, the only authority cited in support of this contention by the surety, concerned affirmative, deceptive representations knowingly made by the government. We have nothing of that kind and nothing equating with fraud in the record before us.

We agree with the trial court's ultimate conclusion when it said, p. 227 of 211 F.Supp.:

"I cannot escape the conclusion that Hawthorn undertook a job with which it was entirely unfamiliar and was unprepared either mechanically or financially to perform it."

It was this unfamiliarity and this lack of preparation which was at the root of the difficulty and of Hawthorn's failure here. The situation is one to be regretted but it is not one for which the government should be made to incur the resulting loss.

Affirmed.