Paul MEINBERG, dba L & P Food Service Equipment Co., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 16267–3.

United States District Court,
W. D. Missouri, W. D.

July 1, 1969.

Lloyd Burke Bronston, Kansas City, Kan., for plaintiff.

John F. Carter, Paul A. White, Asst. U. S. Attys., Kansas City, Mo., for defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, REVERSING JUDGMENT OF THE ARMED SERVICES BOARD OF CONTRACT APPEALS AND GRANTING SUMMARY JUDGMENT FOR PLAINTIFF

BECKER, Chief Judge.

This is a suit brought by the plaintiff under the Wunderlich Act of May 11, 1954 (Sections 321, 322, Title 41, U.S.C.). In the complaint filed herein, it is alleged that, on March 4, 1965, plaintiff and defendant entered into an agreement "wherein the plaintiff was to provide the U.S.A. [through the purchasing and contracting office of Fort Lewis, Washington] sixty (60) coffee urns * * * at a unit price of $743.52 * * * total contract price being $44,611.08"; that thereafter plaintiff "sought to have an extension of time" to deliver the urns to defendant when it discovered that its seller, Victory Industries, Inc., ("Victory" hereinafter), would not deliver urns for less than the "payment of the full purchase price in advance" and that the seller then failed financially and was placed in receivership; that, while plaintiff was negotiating for credit and after it had sought an extension of time, the delivery date of June 20, 1965, passed and "the contracting officer of the department of the Army at Fort Lewis, Washington, held the contract to be in default and submitted a new bid" for the manufacture of urns (which was eventually awarded to Victory at a total price of $46,749.62); that plaintiff was thereby charged by defendant with a deficiency of $2,667.87, on account of which defendant "has held in abeyance the sum of $1,080.43 * * * which would have otherwise been received by this plaintiff"; that all of defendant's acts were "wilful and capricious"; and that plaintiff therefore prays judgment for $1,080.43, the amount alleged to be held by defendant. The Government has counterclaimed for the amount of excess procurement costs, $2,667.87.

The files and records in this case show that after the "default termination" of the contract, as alleged, plaintiff appealed the contract termination and the assessment of excess costs to the Armed Services Board of Contract Appeals. That Board upheld the decision of the contracting officer in declaring a default. The Board made findings of fact as follows:

"Appellant was, as stated, a dealer in, and not a manufacturer of, food service equipment, including coffee urns. The evidence submitted by him indicates that

at the time of award of the instant contract he had conducted his present business for about 20 months and that almost all his contracts with federal and state agencies and private institutions were for less than $10,000. The present contract for $44,611.08 worth of equipment was by far the largest, which appellant is shown to have received in the period mentioned. In order to be able to bid on the instant invitation, he had obtained a quotation from a manufacturer's representative in Kansas City, Mo., who represented Victory Industries Corporation (sic) (hereinafter called 'Victory'), a manufacturer of coffee urns to military specification. Victory was a wholly-owned subsidiary of Stanley Industries Corporation (hereinafter called 'Stanley') and had its plant at Farmingdale, Long Island, N.Y. Unbeknown to appellant, it was in a shaky financial condition, allegedly due to the then recent relocation of its plant. It is said to have enjoyed little credit and to have been short of cash. Victory had not been invited to and had not bid on the instant procurement.

"After award, appellant gave Victory a written purchase order, dated 12 March 1965. Since this was the first order given by appellant to Victory, he attached thereto a letter of his bank, which stated that it was willing to finance appellant's contracts 'upon an assignment of the contracts and accounts as collateral' and expressing the 'hope' that this arrangement with the bank would 'assist him in obtaining the necessary credit.' He also executed an instrument purporting to assign his receipts under the contract to Stanley as a guaranty of payment for the coffee urns. Appellant also somewhat later asked the contracting officer to have all checks in payment of deliveries under the contract made out jointly to himself and his bank. He was quickly advised by the cognizant finance officer that this would be in violation of the contract terms but that an assignment to the bank complying with the Assignment of Claims Act of 1940 (31 U.S.C. 203)

would be honored. On the other hand, Stanley and Victory tried to make clear to appellant that they needed a cash advance or, presumably, some kind of commercial paper which they could discount. Appellant, on the other hand, kept insisting that it had given all guaranties of payment, which Stanley and Victory could ask for and demanded performance of the order. Calls, correspondence and visits between appellant, Stanley, Victory, the bank and respondent did not lead to a resolution of this impasse and at no time did appellant execute a proper assignment of the proceeds of his contract to the bank, so as to obtain from the latter the credit obviously necessary to finance the Victory order or to enable the bank to do so.

"At the end of April 1965 appellant, at the instance of Victory, asked for an extension of time, which was denied. Thereafter, he continued to press Victory for delivery but also sought to find another source of supply. The long and the short of its efforts was that the food service equipment manufacturers approached by appellant either would not accept his order because they did not want to make the equipment or were bidding on it directly or charged prices, which appellant found too high in price, or set delivery dates too far in the future. None of these quotations were accepted by appellant or incorporated into a specific proposal for submission to the contracting officer. At no time in the latter part of the performance period after the end of April did appellant go beyond pressing Victory to produce, on the one hand, and asking the contracting officer to grant time extensions, on the other. These requests were denied, since the equipment was urgently needed by respondent. On 24 June 1965, four days after the contract delivery date, the contracting officer issued a notice of default, by which he found appellant in default due to reasons for which he considered appellant responsible but gave appellant to 9 July 1965 to object to this finding or correct the default. On 12 July 1965 appellant's contract was termi-

nated, since nothing had occurred, either actually or prospectively, to cure the default or to persuade the contracting officer that appellant was not at fault.

"2. *The Reprocurement*

"The invitation for bid to reprocure the coffee urns was issued on 20 July 1965 and bids were opened on 5 August 1965. Fourteen firms were invited to bid, including all firms which had submitted bids for the terminated contract, two firms, which had been invited but had not bid, and two firms, which had not been invited to bid on the original procurement. One of these was Victory. In addition one firm, which had given a quotation to appellant in June 1965, bid, though not invited. Six bids were received and all but one quoted unit prices in excess of $1,000. The only bid under $1,000 was Victory's at $788.89 per unit, or about $66.00 above its original quotation to appellant. The coffee urns were reprocured to the same specifications as those set out in the original procurement. Delivery time was 60 against about 90 days but there is no allegation or evidence that this affected the prices bid by Victory or other bidders. Regardless of Victory's shaky financial position and subsequent bankruptcy and the fact that Victory had failed to supply appellant with the coffee urns, award of the reprocurement contract to Victory was the best way to minimize excess costs. Award to the second low bidder or purchase by appellant from one of the bidders willing to sell to him, would surely have increased the cost of the procurement, assuming appellant to be liable therefor. Victory thereafter performed its contractual obligation notwithstanding its financial condition, though its delivery was not timely. Performance was completed in the spring of 1966 by the purchaser of Victory's assets; the last units shipped by Victory

arrived damaged in transit and had to be returned to the plant for repairs. The making of the repairs does not, however, affect the excess costs, amounting to $2,667.87. They have been duly assessed and payment demanded."

The Board relied upon the following provision of the contract in question to conclude that the excess cost assessment was properly made in the amount of $2,667.87:

"(c) * * * If the failure to perform is caused by the default of a subcontractor, and if such default arises out of causes beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either of them, the Contractor shall not be liable for any excess costs for failure to perform, unless the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule."

Under the provisions of the applicable statute, Section 321, Title 41, U.S.C., review by this Court is on the record and the decision of the Appeals Board is conclusive unless it is fraudulent, arbitrary, grossly erroneous to indicate the bad faith of the Board, or not supported by substantial evidence.[1] Section 322 and the weight of authority also are to the effect that legal error gives the reviewing court cause to reverse the decision of the Appeals Board. United States v. Adams (W.D.Ark.) 160 F.Supp. 143; Associated Traders, Inc. v. United States, 169 F.Supp. 502, 144 Ct. Cl. 744; Anno. 10 L.Ed.2d 1207, 1233. The same authority holds that the question of whether a government contractor's failure to perform the contract arose "out of causes beyond the control and without the fault or negligence of the contractor" is in certain instances a question of law.

---

1. A second statute, Section 322, Title 41, U.S.C., reads as follows:

"No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

The following facts, divulged by the transcript of the record filed in this Court on appeal were not found by the Appeals Board and apparently were not considered by it:

(1) By its letters dated April 5, 1965, and April 15, 1965, Victory inquired of the contracting officer of defendant which stock numbers and specifications to use in manufacturing the urns contracted for by plaintiff. The files and records indicate no timely answer by the Government. Finally on April 27, 1969, Victory sent a telegram by one M. Riddle to the Government, asking for its "immediate advices" with reference to the letters of April 5 and 15. A note written on the telegram received by the Government, made by one "L Rahn, P&C" indicates that on April 26, 1965, the same "L Rahn" had advised M. Riddle to route his requests through the contractor [plaintiff] "as we are not authorized to deal with anyone other than the contractor." Subsequently, a letter of plaintiff dated April 29, 1965, asked the Government for a continuance on behalf of the manufacturer until the "last week in July" and stated that the problem apparently involved a "modification". This was some 56 days after the award of the contract, and Victory had not yet, as the letters indicate, commenced manufacture of the urns.

(2) A letter of "Laura M. Rahn, Contracting Officer" to plaintiff dated May 3, 1965, denied the request for extension, stating that "[i]tems ordered under this contract are urgently needed, as clearly stated in the Invitation for Bids and resulting contract."

(3) Victory did not purport to notify plaintiff of its unwillingness to accept the credit arrangement proposed by plaintiff until April 19, 1965, 46 days after the award of the contract, 38 days after Victory admittedly received the contract between it and plaintiff, and only a few days before initial performance on plaintiff's contract with the Government was due. Actually, the first indication of record of such notification of dissatisfaction with the credit arrangement is a letter to plaintiff from Victory dated May 6, 1965, which refers to the purported telegram of April 19, 1965, as well as the telegram to plaintiff on April 29, 1965, asking him to request the extension for delivery, and asserting that "the problem was credit rather than production." In its letter of that date, Victory admitted that it had not yet undertaken manufacture of the ordered coffee urns, although it protested that it had begun "preliminaries prior to fabrication."

(4) The letter of the Empire State Bank, plaintiff's source of finance, which is dated March 12, 1965, read in part as follows:

"We have assured Mr. Paul Meinberg, the owner of the above firm, that when he finds himself in need of financial assistance for the purpose of paying for the merchandise bought for the above [various Federal Government Contracts], that we will, upon proper assignment, make him short-term loans in order that he may avail himself of the discount offered on these purchases."

Nothing apparently was then negotiated with regard to whether the assignment should be made immediately or after commencement of delivery. Victory's letter to plaintiff, dated March 19, 1965, requesting "suitable forms of assignment" and "guaranty of monies" is at best ambiguous evidence of the original agreement between it and plaintiff by virtue of a disjunctive "or" between the two demands having been crossed out and replaced by an undated, uninitialed, handwritten "and." On April 20, 1965, Empire State Bank advised Stanley that a written assignment from the Government calling for Government payments directly to it was not necessary and that any such requirement could be deleted from the letter of guarantee. As late as April 26, 1969, Stanley (parent corporation of which Victory was a subsidiary) was writing to the bank requesting clarification and stating its understanding to be that Empire would guarantee full payment for all shipments within 10

days of presentation of bills of lading showing prepaid shipment and Government inspection. A second letter of Stanley dated April 26, 1969, reported to plaintiff that the guarantees made by the Empire State Bank had been received and were "acceptable." It added:

> "Due to all this correspondence and time spent waiting for the bank to confirm its guaranty, we have fallen behind in the manufacture and we, therefore, must have at least another thirty (30) days to complete the entire contract."

Accordingly, plaintiff was instructed by Stanley to request an extension of time for performance.

(5) A letter from Stanley Industries Corporation (of which Victory was a subsidiary) dated May 17, 1965, reveals that the subcontractor had not yet begun manufacture of the urns; that they would be "unable" to produce the urns before "the last week of July, 1965"; and that plaintiff should advise "Fort Lewis that we are depending upon a number of suppliers for various components. This plus the fabrication time required for completion makes it necessary to request a shipment date the last week of July, 1965." This letter makes it clear that this necessity for delay is unconnected with the credit differences between Victory and plaintiff, and adds also that unless the extension is granted and notice thereof given to Victory (or Stanley) on or before May 26, 1965, the first shipment could not possibly be made until August.

(6) Plaintiff requested the extension in a letter to contracting officer August F. Rediske dated May 18, 1965.

(7) On May 18, 1965, Stanley wrote to the same contracting officer stating the receipt on May 14 of a letter from plaintiff informing them that they must seek the extension themselves, and also stating that a call to that officer by them on May 17 had revealed that it was plaintiff who should make the extension request. Stanley closed by saying that the requested extension was "much needed". Again, the request was denied by the letter to plaintiff of contracting officer Laura M. Rahn dated May 27, 1965.

(8) On July 14, 1965, six days before performance on the plaintiff's contract with the Government was due, Stanley answered plaintiff's letter of June 11, 1965, in which plaintiff stated that he would hold Victory and Stanley responsible for damages resulting from any default in said contract. In that answer, Stanley stated that "responsibility rests with you" and impliedly renounced any intention of attempting performance by referring to plaintiff's "failure to fulfill" its Government contract and expressing its "hope" that plaintiff would not be penalized for the default.

(9) Victory's initial delivery of coffee urns after receiving the reprocurement contract did not come until September 28, 1965, more than six months after its original deal with plaintiff; and subsequent deliveries took place on December 13–14, 1965, April 25, 1966, and May 2, 1966, much later than the 90-day maximum time for delivery purportedly allowed by the reprocurement contract. The performance which the Government had required of plaintiff on June 20, 1965, on a contract where time was purportedly of the essence, was thus not completed until the Spring of 1966.

These facts, when considered in combination with those found by the Appeals Board, make the conclusory finding of that Board that plaintiff was financially unable to perform his contract one which is not supported by substantial evidence. Plaintiff, by virtue of the commitment made by the Empire State Bank, was fully able to pay for successive deliveries of the urns by Victory, and such payment was guaranteed by Empire. The proposed agreement— as manifested by the bank letter—was clear and unambiguous and should have

been acceptable to any reasonable manufacturer under normal circumstances.[2]

■ Similarly, the finding of the Appeals Board that the default was not beyond the control of the plaintiff is clearly erroneous, in view of the overwhelming evidence to the contrary. The evidence clearly shows that Victory, in spite of credit arrangements which it agreed on April 26, 1965, were "acceptable", was unable to produce the urns before September 28, 1969, even in part, even though they had finally agreed some five months previously that the credit arrangements had been acceptable all along. On May 18, 1965, Victory admitted its difficulty in obtaining components from "numerous" sources. It further admitted that, apart from any financial considerations, it was unable to produce any urns before August 1965. Therefore, it is clear that the reason for Victory's inability to produce was not caused by financial reasons relating to plaintiff's ability to pay. Even after it had gained the reprocurement contract and the promise of certain payment which a direct contract with the Government should offer, Victory was unable to produce the desired urns in the desired quantity until nearly a year later than the contract with the contractor would have demanded.

■ Where the delay was considerably and materially contributed to by inaction of the Government in failing timely to answer inquiry with respect to stock numbers and specifications, in attributing default on the contract to plaintiff's financial inability when the circumstances did not reasonably indicate such but rather indicated the inability of Victory timely to produce the urns, and yet, with such knowledge, refusing requests for continuances and terminating the contract with plaintiff on the grounds that time was of the essence and reprocuring with the party which was to its knowledge unable timely to produce, the fault or delay cannot be attributed either to plaintiff or Victory, but rather falls upon the Government. Even Victory's initial delay in production can be at least partially attributed to the Government's failure to answer early inquiries in regard to specifications. Such inquiries should have been answered to plaintiff, if no direct correspondence with Victory could have been had. Thus, the default was "beyond control" as far as plaintiff was concerned. The lack of good faith of

2. Even if the terms were unsatisfactory to Victory, no prompt notice of such fact was given to plaintiff by it. Victory complained of the financial arrangements only belatedly. There is a probability finding strong support in the evidence that Victory found itself unable to produce and attempted to shift the onus to the purported financial inability of plaintiff. Possibly, therefore, the contract constituted an illusory bargain which Victory entered knowing that it could not produce, or which it found out later it could not comply with. In such an instance, the recent trend in the law on this subject has been to the effect that the "beyond control" clause of such contracts as is here litigated apply only to subcontractors:
"whom the principal contractor could control or for whom it was contractually responsible, and not those concerning whose conduct and reliability a contractor could only hopefully and helplessly speculate". Schweigert, Inc. v. United States, 388 F.2d 697, 181 Ct.Cl. 1184. See also United States for the use of Wellman Engineering Co. v. MSI Corp. (C.A. 2) 350 F.2d 285; MacEvoy v. United States, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163. The application of such a rule to cases like the one at bar would be consistent with the standard definition of "beyond control" as implying "a pledge to exercise human agency to the point of excluding negligence." 5 Words and Phrases, p. 602 (1968 ed.). As McBride & Wachtel point out with some distaste for the rule, however,
"Taken literally, and that is the only way it can be construed, a prime contractor may not be excused by the default, wilful or otherwise, of a subcontractor unless that default was beyond the control and without the fault or negligence of both prime contractor and subcontractor."
8 McBride & Wachtel, Government Contracts ¶ 44.120.

the contracting officer is further evidenced by permitting long delay on the reprocurement contract, when time had supposedly been of the essence in terminating the contract with plaintiff and in refusing requests for continuance when the Government's own delay in respect of specifications was an element in causing delay.[3] Further, the conclusion of the contracting officer and the Appeals Board that plaintiff could have reasonably obtained the urns from sources other than Victory is contradicted by the fact that the only reasonable bid on reprocurement came from Victory.[4] Excess costs should not have to be paid by the plaintiff where they were incurred as a result of the termination of the contract which was not made in good faith. See Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 167 Ct.Cl. 604.

Financial ability to perform a government contract

"does not mean that the contractor must have on hand adequate cash to pay for the entire cost of performance. Nor can we require the small government contractor to have at its disposal the same financial resources as the giant industrial institution. We think the contractor must have available at the time of the contract award reasonable financial resources in the light of business custom and practice either on hand or through its customary lines of credit, to finance the expected costs of production." *Id.* at 98.

Further, the contracting officer did not submit complete findings with regard to the termination as required by the applicable regulations of defendant. Had he done so, however, he could have submitted none consistent with the overwhelming evidence which would have supported his decision to terminate the contract with plaintiff and reprocure the urns from Victory.

Therefore, in accordance with Rule 56, F.R.Civ.P., it is

Ordered that defendant's motion for summary judgment be, and it is hereby, denied. It is further

Ordered that on defendant's motion for summary judgment, plaintiff be, and he is hereby, awarded summary judgment in the sum of $1,080.43, plus interest from date of June 20, 1965.

3. As is noted in United States v. Adams, *supra*, a valid defense to being charged for excess costs is "Whether the excess costs were reasonably incurred by the Government within the meaning of the contract." *Id.* at 151. Thus, where the Government, on reprocurement, is not in fact "replacing" the contract between it and the terminated contractor, but instead is "placing" a new contract calling for different items, the former contractor is not chargeable for excess costs. That such was the case here is arguable from the fact that plaintiff was held to a "time-is-of-the-essence" provision while the reprocurement contractor was not.

4. On June 14, 1965, Victory announced that it would not be responsible for any failure to produce on June 20. The record shows that after April 26, and before June 14, plaintiff had sought the urns from other sources and found them to be unobtainable. In his letter to the contracting officer dated June 4, 1965 (which was after Victory had for the first time made clear that it was unable to produce until August), plaintiff noted that most manufacturing houses were entering their "summer vacation period." The same letter noted the various firms which plaintiff had contacted. One professed capacity, but its capacity does not appear of record. A second said the urn was too "fantastic" for cost-saving production; and a third, which plaintiff accounted as his best possibility, offered manufacture but at a considerably higher price than that made by Victory. In fact, the rate was prohibitive if plaintiff were not to suffer a substantial loss on the government contract. Again, on August 10, 1965, plaintiff notified defendant that no one manufacturer which he had contacted had had time to produce within the time limit. Also, the Government's "abstract of bids" on reprocurement shows other bidders bidding, per 60 urns, prices of $1065.37, $1117.00, $1050.00, $1000.00, $1365.00, $1125.00, and that two of the bids were nonresponsive in that they did not "meet delivery requirements of the invitation." These bids were greatly higher than Victory's reprocurement bid of $788.89, which in turn exceeded Victory's original bid to plaintiff.